### HALL v. MONTGOMERY WARD & CO.
### HALL v. SEARS ROEBUCK & CO.
#### Civil Actions Nos. 86–W, 87–W.

District Court, N. D. West Virginia.

Sept. 29, 1944.

John Boyle, Jr., of Washington, D. C., and Earl L. Maxwell, of Elkins, W. Va., for plaintiff.

James M. Guiher, of Clarksburg, W. Va., Kent B. Hall, of Wheeling, W. Va., and Williams, Bradbury & Hinkle, Elwood Hansmann, and Leon F. Shackell, all of Chicago, Ill., for defendants.

BAKER, District Judge.

Plaintiff, William D. Hall, is a citizen of Elkins, West Virginia.

Defendant, Sears Roebuck and Company, is a non-resident corporation. Subsequent to the date the patent in suit was granted, and prior to the filing of the complaint herein, Sears Roebuck and Company maintained a regularly established place of business in Wheeling, West Virginia. On February 22, 1942, from their Wheeling store, it sold to Emmett Simmons, at Wheeling, in the Northern District of West Virginia, the Stewart Warner South Wind Automobile Heater, filed in this trial as Plaintiff's Exhibit A. There came with this heater a leaflet, Plaintiff's Exhibit No. 4.

Defendant, Montgomery Ward and Company, is a non-resident corporation. Subsequent to the date the patent in this suit was granted, and prior to the filing of the complaint herein, Montgomery Ward and Company maintained a regularly established place of business in Martinsburg, in the Northern District of West Virginia, and on or about January 29, 1941, at said Martinsburg store, it sold to one, William E. Elliott, the Stewart Warner South Wind Automobile Heater, Plaintiff's Exhibit B. There came with this heater two leaflets, Plaintiff's Exhibits Nos. 9 and 10. Between the same dates, Montgomery Ward and Company maintained a regularly established place of business in Elkins, in the Northern District of West Virginia, and from that store sold a Stewart Warner South Wind Automobile Heater, delivery of said heater being made during the first few days of February, 1941.

Plaintiff gave defendant, Sears Roebuck and Company, notice of infringement of his patent in suit No. 2,159,658 in the year 1940.

Plaintiff gave Montgomery Ward and Company notice of infringement of his patent in suit No. 2,159,658 in January, 1941.

Stewart-Warner Corporation, the manufacturer of the alleged infringing heaters, agreed to hold Sears Roebuck and Company and Montgomery Ward and Company harmless, subject to these conditions: First, that Montgomery Ward and Company and Sears Roebuck and Company transmit promptly to Stewart Warner Corporation any notices, papers, summons, or things of that kind, which they might receive, and with the second reservation that Stewart

Warner Corporation be free to select the counsel by whom Montgomery Ward and Company and Sears Roebuck and Company would be defended. When the summons were issued in each of these cases Stewart Warner Corporation was promptly given notice of these facts, and all papers were sent to them, and they selected, as defense attorneys for the defendants of record, the firm of Williams, Bradbury, and Hinkle (Record 8248, lines 1-12, Record 8249, lines 7-13).

Stewart Warner Corporation is paying the bulk, if not all, the expenses incident to the defense of this suit. (Record 8250, middle of page.)

The above-entitled causes for patent infringement were begun February 25, 1941. The two causes, being identical, were tried together, and this opinion is intended to cover and decide both cases.

Plaintiff was the owner of United States Letters Patent No. 2,159,658, "Control System," from the date of its issue on May 23, 1939, to the date of trial, together with all rights of action for infringement thereof. The complaints declare that Stewart Warner South Wind Automobile Heater infringes United States Letters Patent No. 2,159,658, granted to William D. Hall, the plaintiff, for an invention entitled "Control System." Plaintiff relies particularly upon Claims Nos. 5, 6, 11, 14, 21 and 27, of his patent.

The trial was long and very tedious, extending for more than eighty days, and the record exceeds ten thousand pages. Both parties were given every opportunity to state to the very fullest extent their respective positions. The defendants consumed two days in making an opening statement, cross-examined plaintiff for fourteen days, twice calling plaintiff as their own witness, and in addition to a four and one-half day pre-trial deposition, took numerous depositions, presented a defense lasting forty-seven days, and set forth their position at some length during plaintiff's rebuttal period. During the trial many hundreds of physical demonstrations were made in the Court Room and in a workshop set up in Windsor Hotel, Wheeling. The South Wind heaters were demonstrated on various automobiles, operated on the road and while standing. Briefs set forth the contentions of the parties at great length, and final argument was unlimited as to time.

The plaintiff's patent relates to a "Control System" for burners and specifies:

"The dominating feature of my invention resides in the provision of separate switches for controlling the igniter coil and the valve."

The Hall patent, Figure 5, has a burner 87, an igniter known to this art as a hot-wire igniter 62, a resistor 63 in series with the igniter, and a valve 73 operated by a solenoid 72. Mounted on the base 65-80 are the bimetallic strips 66 and 79 which respectively carry contacts 84 and 85. The patent, page 3, describes Figure 5, in part, as follows:

"The current flow through the igniter raises the temperature thereof to igniting temperature and the heat radiated from resistor 63 to bimetallic strip 66 causes this strip to flex. * * * When heated, strip 66 flexes until contacts 84 and 69 engage each other. * * * solenoid 73 causes the valve to be opened thereby establishing a flow of gas to the burner. * * * gas from the burner flows into flasher 61 and is ignited by igniter 62 * * * The entire supply of fuel is soon ignited and the heat therefrom causes the bimetallic strips to bend to the left thereby opening contacts 85. In Figure 8, I have illustrated the parts just after the igniter circuit is broken. As the burner continues to heat, the bimetallic strips 66 and 79 continue to move the members 74 and 77 to the left until at a very high temperature they reach a position such as is illustrated in Figure 9. At this position, assume that the gas supply is accidentally stopped and immediately restarted * * * when the flow of gas resumes it would escape. However, I have provided a control switch capable of recycling, and therefore, within a short period of time the burner will cool a few degrees and the bimetallic strips 66 and 79 will disengage members 69 and 76 respectively. * * * When the igniter switch 85 recloses, resistor 63 will raise the temperature of strip 66 until contact 84 is remade. This latter action will reopen the valve 73 and an attempt to relight the burner will be made as heretofore stated."

"* * * my principle is even broader than electrical circuit arrangements specifically recited above, and rather than attempt to list the numerous modifications which I have experimented upon and conceived, I am defining the principle in the appended claims."

Hall's patent has another form of invention shown in Figure 1. An igniter coil 6 is controlled by "circuit breaker 7, the con-

tacts 8 of which are normally closed. This circuit breaker may be of any detailed construction, being shown essentially as a bimetallic disc or diaphragm * * *." Another bimetallic strip 14 controls "solenoid 16 which has for its core the stem 17 of the fuel valve 55." The igniter 6 heats bimetallic circuit breaker 7, and is (see claim 14): "means for opening and reclosing said circuit breaker if combustion fails to be established on the first effort."

The Hall patent in suit goes into great detail throughout its specifications to describe the invention. Hall, in his patent, did not show simply a pair of bimetallic strips diagrammatically operating an igniter and valve, as he might have done, but illustrated practical devices that had been actually constructed and tested by him.

In comparing the Hall patent with the South Wind Heater, it is necessary to determine which portions of the patented device really do the work. Machine Co. v. Murphy, 97 U.S. 120, 125, 24 L.Ed. 935; Saco-Lowell Shops et al. v. Reynolds, et al., 4 Cir., 141 F.2d 587.

Hall's patent illustrates a Combination made up of a burner, valve, hot-wire igniter, and two bimetallic strips respectively controlling the igniter and the valve. These are the parts that really do the work. These parts are all relatively near the burner and are operated by heat therefrom without the necessity of the complicated external control boxes of the prior art. The nature of Hall's improvement was described by the Board of Appeals of the Patent Office as follows:

"Appellant points out that by his mechanism a simple structure can be placed close to the burner and effect a very satisfactory result, as contrasted with the complicated mechanism shown in McCabe 1,853,444, for example."

The simplicity and result flow from the new Combination and not from any detailed construction of any particular part thereof. Hall did not attain simplicity by changing the valve of some prior art combination patent, nor by changing the igniter, nor by improving or simplifying any particular part of a combination patent of the prior art. Hence, in determining infringement, it is the combination that will be compared with the South Wind Heater, and not such details of the separate parts of the combination as are convenient ways of building the whole device.

## The South Wind Heater

The South Wind Heater is a gasoline burning automobile heater. After the heater becomes hot the fuel line vaporizes the gasoline fed thereto and, therefore, the fuel reaching the heater is a pure gas. The South Wind Heater has a coiled hot-wire igniter for igniting the fuel. There is a switch (operated by a bimetallic strip) directly in series with the hot-wire igniter to cut off current to the latter when the fuel is ignited. Another bimetallic strip of C-shape is located above the fan of the heater and upon undue rise in temperature for any reason operates a so-called pop-valve. The pop-valve is not in the fuel line, but is connected to it by a tube. Nevertheless, it serves the function of a valve by putting out the flame when the bimetallic strip is heated. The South Wind Heater is started by pulling the knob which closes the circuit and opens the main valve. After ignition, the igniter switch becomes hot and a bimetallic strip causes the contacts of that switch to break the current to the igniter. If the heater rises in temperature to an excessive degree, the C-shaped bimetallic strip will flex and the pop-valve will greatly reduce the flow of fuel and stop combustion. The heater will cool and the igniter switch will again close its contacts and start the heater. Other operations of the South Wind heater will be considered later.

## Comparison of Combination Claims 5, 6, 11 and 27 with the South Wind Heater and the Prior Art

The prior art control systems are very complicated. All of those in the evidence, that purport to control both an igniter and valve according to the temperature near the heater, have large external control boxes. Hall's departure from the prior art was not a mere omission of the external controls usually employed, but a new arrangement of parts that does not require the complicated external controls of the prior art; hence, the omission was not a mere taking away of the parts. Commenting on the Hall patent, Counsel for defendants said:

"I do say this, that the young boy, as good as he was and as bright as he was, did devise a simple system, he omitted something which, after twenty or thirty years of experience by older men, had been found desirable."

The South Wind Heater omitted precisely the same parts that Hall omitted.

The South Wind control system has exactly the same number of primary parts as Hall's Figure 5 has.

Did South Wind achieve its simplicity by simply changing the valve of a prior patent? No, certainly not. Is its simplicity due to changing the bimetal of some prior art patent from an underheat to an overheat bimetal? No, certainly not.

The simplicity of South Wind is due to the same main reason as Hall's simplicity; namely, direct control over the hot-wire igniter coil and pop-valve by two bimetallic strips both near the burner.

Plaintiff's Exhibit 18 properly illustrates this important thing; namely, that it is the new relative relation of the two bimetals with the igniter coil and the valve that promotes the simplicity and not the mere changing of one of the parts per se.

It is this relative relationship or combination that is the infringement, and not some one part of the entire system. When examined in this light, the variations in the form of the several parts of South Wind from Hall's patent (each of which have the same primary function, however) · fades away into the realm of irrelevancy.

Counsel for defendants, in their brief, page 19, correctly state:

"The result sought by both Hall and by the makers of the South Wind heater was broadly the same, namely, control of the combustion of fuel in a small heater; but the control of such combustion, merely as an end, effect or result, has been and is, open to any one, as long as he does not invade another's monopoly of particular means to achieve the result,—irrespective whether the other's means are simple or complicated."

The mere fact that the plaintiff's as well as the defendants', combinations are simple and accomplish the same result is not the basis of liability, but it is the fact that the defendants not only accomplish the same results and the same degree of simplicity, but employ the same combination of parts, operating in practically the same way.

Every element of claim 27 is in the South Wind Heater, even if the claim is strictly construed. Not only is the letter of the claim infringed, but the spirit of it as well. Claim 5 calls for recycling and it is obvious from the accepted definition of that term in the art, and as used in the patent, that the South Wind Heater recycles. In that

heater, in event of a shut down by the pop-valve, the burner cools and the igniter switch recloses, thereby relighting the burner. The time required to reclose the igniter circuit depends on the time required for the igniter switch to close. Claim 6 states that the igniter switch is separated by a wall from direct contact with the products of combustion. The claim also recites: "whereby the said wall inherently also increases the time lag of response of said circuit breaker to temperature changes of said space, means for reducing said increased time lag of response by modifying the quantity of energy which said thermal element would ordinarily otherwise receive." In the Hall patent, the igniter 6 heats the circuit breaker 7 and is the "means for reducing * * *, etc.," of claim 6. There is also a heater 19 that does indirectly what igniter 6 does directly. It was thoroughly established by careful tests that in South Wind heaters there is a similar heating that accomplishes, as in the patent, a substantial and desirable reduction in the time required for the igniter switch of South Wind to operate. All the elements of claim 6 cooperate with the ones under consideration and are all in the South Wind heater.

Claim 11 is infringed since the South Wind Heater has all of the elements of the claim and performs the function of claim 11 in the way Hall does and attains the same results.

Defendants make quite a point of the fact their C-shaped bimetallic strip operates upon an excessive rise in temperature, whereas Hall's corresponding bimetallic strip operates upon a drop in temperature. Since the Hall patent is for a combination, and is not a patent on the parts per se, it is necessary, in examining the matter, to determine if the change is a change in the combination as such, or whether it is a variation in one element, the combination remaining essentially the same.

Hall's new combination shows a way of igniting and controlling a burner in a safe manner. Obviously different burners, to which the combination is applicable, have slightly different problems to be overcome, and one skilled in the art would be expected to make such minor changes in the parts of the combination as necessary to protect against possible dangers perceived to be in the particular heater to which the combination is applied. In the heaters to which Hall applied his invention, Hall perceived

the principal danger to be an escape of gas and he illustrated a bimetallic strip operating to close the fuel line upon a drop in temperature as the best mode of applying his invention. The makers of the South Wind heater perceived an excessive rise in temperature as the principal danger in their heater. Using the same number of parts, of the same character and arrangement, the makers of the South Wind heater have merely turned the bimetal of Hall's patent face for face so it operates in response to a rise in temperature instead of in response to a drop in temperature. The evidence is overwhelming that this change would be obvious to one skilled in the art. The application of the Hall patented control system to a gasoline heater with the above-noted change in the bimetallic strip, and other minor changes, was simply applying Hall's combination to a related use, making only obvious changes.

■ In determining whether there is infringement of a "process" or "method" claim, the courts do not recognize a defense that the apparatus for carrying out the process is different.

■ The test of infringement, so far as the method claim is concerned, is whether or not any apparatus, no matter how different the apparatus may be, sold by defendants, will, in its normal use, perform the acts recited in the claim. Waxham v. Smith, 294 U.S. 20, 55 S.Ct. 277, 79 L.Ed. 733; Expanded Metal Co. v. Bradford, 214 U.S. 366, 381, 385, 29 S.Ct. 652, 53 L.Ed. 1034; Cochrane v. Deener, 94 U.S. 780, 24 L.Ed. 139; Telephone Cases (Dolbear v. American Bell Tel. Co.) 126 U.S. 1, 533, 8 S.Ct. 778, 31 L.Ed. 863; Gulf Smokeless Coal Co. v. Sutton, Steele & Steele, 4 Cir., 35 F.2d 433, 436. In the Waxham v. Smith case, it was held [294 U.S. 20, 55 S.Ct. 278, 79 L.Ed. 733]:

"Petitioner does not avoid infringement of respondent's method patent merely by employing it in a machine of different structure than respondent's, whether more or less efficiently."

Other facts in the case would tip the scales in favor of the plaintiff if there was any doubt on infringement. While these facts are not controlling under the view of the patent taken above, they are worth mentioning. In the first place, other claims in the patent than those mentioned, such as claim 9, are narrower and include the things that defendants seek to read into the broad claims to avoid infringement. In the second place, plaintiff proved that while developing his invention, he conceived and built his combination with an overheating bimetallic strip of the exact nature as the overheating bimetallic strip of defendants' heaters and performing exactly the function and operations thereof. He had other elements of the South Wind heater, such as the fan, ceramic reigniter, etc., which are not parts of the patented combination, but were said by defendants, at the trial, to have some significance here. Hence, plaintiff's real invention clearly was broad enough to include the things now charged as infringements.

In Tilghman v. Proctor, 102 U.S. 707, at page 713, 26 L.Ed. 279, the Supreme Court observed:

"As having some bearing upon the proper construction of the patent in suit (which will presently be more particularly examined), it is proper to observe that Tilghman's actual invention, as demonstrated * * * in 1853, before making any application for a patent, was not confined to the use of a coil of pipe * * *."

The variations, now asserted by defendants as controlling, were shown by Hall's early work to be immaterial ones. Plaintiff, in compliance with the law, described in his specifications what "he" thought the best mode of applying his invention, and he recited the principle broadly in the claims. Care must be taken in following the doctrine of Tilghman v. Proctor, supra, to make sure that the development work of the inventor is not substituted for the patent as the basis of the charge of infringement, and the proper legal perspective must always be kept in mind, otherwise applying the doctrine is dangerous. In this case it is not necessary to resort to the development work, as it was in Tilghman v. Proctor, supra, in order to reach a proper decision; however, application of the doctrine to the facts at hand confirms the finding reached from the other evidence, and leaves the plaintiff's proofs so clear and satisfactory that no reasonable doubt on the issue of infringement can exist.

### Relation of the Prior Art to Claims 5, 6, 11 and 27.

Defendants introduced in evidence a large quantity of prior art to show the Hall patent invalid, and to show that the control system of the South Wind heater is old in

the art. They termed Mr. A. N. Schultz and Mr. Frank Black their "principal" witnesses on the prior art. Schultz testified at great length, but related little, if anything, of the prior art except certain Mercoid controls. On cross-examination he testified "the Mercoid controls are widely different than the controls of the South Wind heater," that the Hall patent is "remote from the activities of the Mercoid Corporation," and that the Mercoid controls in evidence will not work on direct current as the Hall patent and South Wind heater will. It is very clear from the entire record that the Mercoid controls do not embody the combination claimed, are many times as expensive as the South Wind heater, and cannot be applied to small heaters. Furthermore, the proofs do not justify considering these controls as proved, except to the extent that incomplete disclosures thereof are found in certain advertising leaflets which were proved. These leaflets are too incomplete to be of any value in proving the Hall patent old in the art.

Prior patents to McCabe No. 1,674,051, Haas No. 1,476,201, Harrington No. 1,985,-991, and Dever No. 1,969,967 are, like in the case of the Mercoid controls, remote from Hall's patent and widely different than the South Wind heater. They are all complicated, have external parts not found in either Hall's patent or the South Wind heater and which cannot be omitted, are expensive, and aside from failing to show the substance of the invention, as defined in the claims, they fail to disclose anything coming within the letter of the claims.

In their brief, Counsel for defendants refer to the combination of Breese No. 1,-633,066 and Hart No. 1,724,132, and contend:

"The patents to Hart No. 1,724,132 (Def. Ex. 40), and Breese No. 1,633,066 (Def.Ex. 327), disclose whatever subject matter is common to the Hall patent and the South Wind heater."

It is clear from the evidence that to combine the Hart and Breese patents involves invention. For many years inventors in this art have been very prolific in obtaining patents, only a few of which have gone into use. They not only completely overlooked such combinations as Hart plus Breese, but have directed their efforts exclusively to changing one or more parts of an external control box in each instance of record where the electrical igniter and fuel valve are controlled by temperature conditions prevailing near the heater itself. To say that one only reasonably skilled in the art would obviously do something which was contrary to the line of thought prevailing for many years cannot be justified. If the evidence disclosed simply the Hart and Breese patents alone, without other patents and evidence as to the development of the art, it could be argued with greater force that the combination was an obvious one. Even in that event the argument could not prevail. The evidence shows that there are peculiar operations resulting from the Hart and Breese combination not found in the patents taken separately. There is nothing in either of these patents to instruct one skilled in the art that he should add the features of the other.

The South Wind heater is not simply an aggregation of old elements, such as the old elements of Breese and Hart. Combining the old elements that make up the South Wind heater creates a control system bringing new results, a simpler system with less parts than had been known to inventors of the prior art, and a system in which every part has some effect upon the operation of all others. To illustrate one of the new operations, two paragraphs of page 91 of defendants' brief will be quoted with portions underscored. The underscored portions show operations of the Hart apparatus that would not occur if it was not for the addition of the Breese apparatus thereto:

"When the Breese thermostat and overheat limit control is used with a burner like the Hart oil burner with its hot wire igniter and automatic igniter control switch, the sequence of events would be as follows in case overheating should occur: The bimetal E of Breese will move its right hand end toward D-3 downwardly to cause the valve part D-4 to engage valve seat D-2 and cut off the flow of fuel to the burner. Combustion will cease and the burner and the bimetal E will cool along with the rest of the furnace until the cooling of the bimetal raises valve D-4 from its seat and admits fuel to the burner. With continued cooling, *the igniter switch 43 of the Hart oil burner will close the circuit to the igniter and the fuel will be ignited.*

*"If upon the second ignition of the fuel the furnace again overheats, the cycle will be repeated. Such recycling could continue indefinitely under the same emergency circumstances which would cause it to occur in the South Wind heater."*

None of the operations in the last quoted paragraph would occur in either Breese or Hart patents if it were not for the other in the combination of them.

## Claim 14 Is Valid and Infringed

The last clause of claim 14 calls for means for opening and reclosing the circuit breaker if combustion fails to be established on the first effort. Tests conducted at the trial demonstrated that the bimetallic strip of the South Wind heater that operates the igniter switch of that heater will repeatedly open and close that switch during attempts at reignition. The same beneficial results and advantages are found in the defendants' heater as in the patent, namely, that the probability of ignition is enhanced. The function and manner of accomplishing the results are the same in South Wind as in Hall's patent.

Defendants contend that the McGowen patent differs from the South Wind heater only in degree. The evidence indicates, however, that the South Wind heater probably derives 10,000 times the heat from its ignition circuit as McGowen derived from his ignition circuit. In the South Wind heater, as in Hall's patent, the heat produces an on-and-off action of the igniter switch, whereas McGowen has such a small amount of heat that this action will not occur. The situation was well stated by Counsel for plaintiff, in their reply brief, as follows:

"The difference is not whether the Hall patent and the South Wind heater use ten units of heat as contrasted to nine units in the prior art. Such a change from nine to ten, in the absence of a change in function, would be merely a matter of degree and the decisions Defendants' Counsel cited in his brief would apply. In the case at bar, the change is from a grossly insignificant functionless amount, to 10,000 times that much which latter amount of heat causes an on-and-off action set forth in claim 14." * * * Citing Allen Filter Co. v. Star Metal Mfg. Co., 3 Cir., 40 F.2d 252, 254, certiorari denied 282 U.S. 848, 51 S.Ct. 27, 75 L.Ed. 752.

## Claim 21 Is Valid and Infringed

Claim 21 is a "method" claim allowed by the Board of Appeals of the Patent Office. The claim is clear on its face and will be quoted in lieu of a description of the same:

"21. The method of utilizing an igniter of the hot-member type to establish combustion of fuel at a burner which includes heating the igniter, subsequently establishing a flow of fuel at the igniter, stopping the supply of fuel in event it fails to ignite, and immediately reestablishing a flow of fuel."

No prior art patent has recognized the advantage of this method, or has in any way mentioned varying the mixture or stopping fuel flow, nor in any way disturbing or modifying either the amount of fuel or the mixture, during the ignition effort.

Strong evidence supports the view that Hall practiced this method in 1934 and found it to have important advantages. The prior art inventors recognized that serious difficulties were encountered in attempting to ignite fuel with a hot-wire igniter. The makers of the Mercoid TU control employed a constant current transformer of considerable size and a very heavy igniter to bring about ignition. The Hall method of interrupting fuel flow clearly works and is of substantial advantage in igniting the South Wind heater.

Defendants contend that they do not "subsequently" establish a flow of fuel, as recited in the claim. Certainly, in their heater, the fuel to be ignited flows after the igniter is turned on. In the South Wind heater flow of fuel will stop and restart three times during the normal starting of an automobile and each of these restarting operations is a "subsequent" establishment of the flow of fuel. Following the first and second time that the fuel is restarted, it is again stopped and restarted. This clearly is an adoption of plaintiff's invention. Defendants also contend that the fuel flow in the South Wind heater is never stopped, but merely reduced. The evidence shows that the fuel is reduced to a small functionless trickle through the combustion chamber. Hence, for all patent-law purposes, it is stopped. At the igniter itself the fuel flow drops to such a low value that plaintiff's sensitive instruments showed little, if any, flow.

The only serious question of law arising in connection with this case relates to claim 21. Counsel for defendants, in their brief, page 160, contend: "There is not enough left of the doctrine of contributory infringement to impose any liability on the defendants for sales of unpatented South Wind heaters." The cases cited by defendants are recent Supreme Court decisions refusing to hold a defendant guilty of contributory infringement as long as he was misusing the patent. These cases do

not refuse to protect an individual inventor, or one deriving rights under him, unless there has been misuse of the patent. Here, the defendants sell a heater. If their installation instructions are followed, method claim 21 will be infringed during normal and expected operation of the automobile. Hence, defendants are contributory infringers. See Electro-Bleaching Gas Co. v. Paradon Engineering Co., 2 Cir., 12 F.2d 511; Cugley v. Bundy Incubator Co., 6 Cir., 93 F.2d 932, 935; B. B. Chemical Co. v. Ellis, 1 Cir., 117 F.2d 829, 834, affirmed 314 U.S. 495, 496, 62 S.Ct. 406, 87 L.Ed. 367.

### Plaintiff's Patent Is One of High Rank

■ Under the view taken above, the Hall patent, even if strictly construed, is infringed by defendants. It has been consistently held, however, that generic patents and those of high rank are entitled to a broad range of equivalents.

In Continental Paper Bag Co. v. Eastern Paper Bag Co., 210 U.S. 405, 28 S.Ct. 748, 52 L.Ed. 1122, the finding of infringement was affirmed, the courts below having found the patent one of high rank and entitled to broad coverage. The plaintiff in that case never built a full-size machine, but merely a "model" for demonstration at the trial. See Eastern Paper Bag Co. v. Continental Paper Bag Co., C.C., 142 F. 479.

In Hildreth v. Mastoras, 257 U.S. 27, 42 S.Ct. 20, 66 L.Ed. 112, the patent was for a crude machine that operated in a crude way. The patent was held entitled to a broad range of equivalents in view of its generic character. Counsel for plaintiff, in their brief, discussed this decision at great length, submitted copies of the patent involved as well as the prior art patent and the infringing patent. It is clear that here Hall's improvement is equally as "generic" as in that case. See also Crown Cork & Seal Co. v. Aluminum Stopper Co., 4 Cir., 108 F. 845, 868.

■ Judged in the light of the foregoing cases, plaintiff's patent is certainly of high rank and entitled to a broad range of equivalents. Hall's work deserves more merit than in the cited cases for Hall, in his patent, illustrates fully developed systems evolved after considerable work. These systems were fully and successfully tested under operating conditions.

It is true that the only commercial practice of Hall's generic idea is that which defendants have made of it, but this cannot be given controlling importance as defendants seek to give it.

Hall placed his control system before the Reznor Mfg. Co., a gas stove manufacturer, in 1934, when Hall was twenty years old. The Reznor Company manufactures mechnical devices, such as gas stoves, and is not particularly skilled in making electrical devices. When Hall presented his system, business was very slack at the Reznor plant. Reznor, however, bought an option in Hall's system for $100. Never before had Reznor paid as much for an option or patent right in any ignition system whatever, although the Reznor Company received ideas every day. Reznor did little in testing Hall's devices, and Hall was tied up in this manner until 1936, at which time his employment as an engineer took him from city to city. During all this time and subsequent years Hall was unable to satisfy the Patent Office to allow the patent, and at the time of his appeal to the Board of Appeals, no claims were allowed. Late in 1938 the Board of Appeals said the prior art was not especially close and allowed certain claims, leaving the question of others to the Examiner. At the time of the trial some manufacturers were considering the Hall patent. The facts leave no import that there was a lack of utility.

Defendants urge at length that Reznor rejected the Hall device by reason of an inherent explosive condition, caused by sparking of contacts 15–38 of Hall's Figure 1. Reznor did testify that he had an explosion in 1934, which he thought was due to sparking of the contacts. He said he rejected Hall's device on this ground. The overwhelming weight of the evidence is that the contacts will not cause an explosion. Defendants' experts, at the trial, attempted to reproduce the explosive condition, and at a time that according to their theories such an explosion might follow, the plaintiff put his head close to the heater door, which was open, thus exposing his face to the alleged danger. This demonstrated confidence in the fact there would be no explosion. Following this, defendants' expert testified "fortunately the sparks did not ignite the gas and Mr. Hall is still alive." The fact is that no one, who claims to be an expert on such matters, has ever witnessed such an explosion, although numerous witnesses were called on both sides. Reznor, who is not an expert in these matters, when asked if the sparking of the contacts caused the explosion he alluded to,

said (R. 5552): "I can't answer that. I can't answer it definitely yes, or no, because you couldn't see in there \* \* \*." The evidence shows that Reznor was not familiar with the Hall apparatus in all of its phases, that Reznor often changed the device, and that the alleged explosion probably resulted, not from sparking of contacts, but from causes which do not reflect upon Hall's invention.

### Late Presentation of Claims

Defendants urge at length that Hall's claims, in their present wording, were presented long after the South Wind heater was on the market. In some cases that is true; however, Hall's original application of October 1, 1934, had a complete disclosure of Hall's invention and had claims broad enough to comprehend the South Wind heater. Hall presented claims from time to time, directed to the same subject matter as the claims in suit. Furthermore, Hall has fully established that he invented the devices in question prior to the earliest date claimed by defendants. He also established that his early work demonstrated that devices, such as the South Wind heater, are obvious in view of the thing shown in the patent. This case is, therefore, distinguished from Akro Agate Co. v. Master Marble Co., D.C., 18 F.Supp. 305. There the claims introduced new matter (Syllabus No. 13, 18 F.Supp. at page 335), and the first disclosure of the invention was that made to the Patent Office after defendants embarked upon their commercial career. Here the defendants have not shown the exact character of the South Wind heater that are alleged to antedate the introduction of the claims. It cannot be said that they have shown that prior to the grant of the patent in suit that heat from the igniter circuit passed to the igniter switch. On the other hand, there is evidence tending to show that after claim 14 was filed that defendants changed the switch elements so as to obtain a substantial increase in the heating.

Based on the whole record, I conclude:

■ 1. This Court has jurisdiction of all the parties and of the matter in controversy.

2. It is worthy of note that Hall's application for patent, in issue in this case, was to a large extent prosecuted by the plaintiff himself. He encountered numerous difficulties; had to appeal to the Board of Patent Appeals to secure his rights. Prior patents, relied upon as anticipations, were carefully considered, and numerous changes were made in the claims before the patent finally issued. All which is fully shown by the entries on the file wrappers in this case.

■ It is well settled that in such a case the presumption of patentability arising from the issuance of the patent is greatly strengthened. While, of course, the judgment of the Patent Office officials is not absolutely binding on the Court, it is entitled to great weight and is to be overcome only by clear proof that they were mistaken, and that there is lack of patentable novelty. Gulf Smokeless Coal Company v. Sutton, Steele & Steele, 4 Cir., 35 F.2d 433; Imperial Bottle Cap & Machine Co. v. Crown Cork & Seal Co., 4 Cir., 139 F. 312; J. A. Mohr & Son v. Alliance Securities Co., 9 Cir., 14 F.2d 799.

■ The question of invention is one of fact. United States v. Esnault-Pelterie, 299 U.S. 201, 205, 57 S.Ct. 159, 81 L.Ed. 123.

■ When Congress has set up an administrative agency to whose informed judgment and discretion it has committed the determination of questions of fact, such determinations will not be set aside by the Courts if there is evidence to support them. Even though, upon a consideration of all evidence, a Court might reach a different conclusion, it is not authorized to substitute its own for the administrative judgment. Swayne & Hoyt v. United States, 300 U.S. 297, 303, 57 S.Ct. 478, 81 L.Ed. 659.

■ The Board of Appeals apparently carefully considered the whole matter and distinctly allowed the claims involved in these cases. The authorities agree that a patent allowed by the highest tribune of the Patent Office is entitled to greater respect than an ordinary patent. Celanese Corporation v. Essley Shirt Co., 2 Cir., 98 F. 2d 895; Reo Motor Car Co. v. Gear Grinding Machine Co., 6 Cir., 42 F.2d 965; Folberth Auto Specialty Co. v. Mayo-Skinner Mfg. Co., D.C., 292 F. 883; Rubenstein v. Slobotkin, D.C., 33 F.2d 603; Trane Co. v. Nash Engineering Co., 1 Cir., 25 F.2d 267; Wayne Mfg. Co. v. Coffield Motor Washer Co., 8 Cir., 227 F. 987, 989.

3. Hall's original application for patent in suit, filed October 1, 1934, had claims covering the South Wind heaters, sold by defendants.

440

4. The South Wind Heaters, sold by the defendants, are mechanisms or mechanical equivalents of mechanism, such as are disclosed and claimed in Hall Patent 2,159,658. Saco-Lowell Shops v. Reynolds, 4 Cir., 141 F.2d 587 (4 CCA).

5. The Stewart Warner South Wind Heaters, sold by defendants, exemplified by plaintiff's Exhibits A, B, C, and D, include the elements of Claims 5, 6, 11, 14, and 27, of Hall Patent No. 2,159,658 in suit. Walker on Patents, Dellers Edition, page 3071.

6. Claims 5, 6, 11, 14, 21, and 27, of Hall Patent No. 2,159,658, are valid and have been infringed by defendant, Sears Roebuck and Company and by defendant, Montgomery Ward and Company.

7. Defendants' machines infringe said Claims 5, 6, 11, 14, 21, and 27, of said Hall Patent. Williams Manufacturing Co. v. United Shoe Machinery Co., 316 U.S. 364, 62 S.Ct. 1179, 86 L.Ed. 1537; Supreme Court Transcript of Record, page 482, Vol. 88, case 332 of 1941.

8. The invention, shown in the Hall patent in suit, and described in the Claims in suit, were new and useful and involved invention over the prior art. Williams Manufacturing Co. v. United Shoe Machinery Co., 316 U.S. 364, 62 S.Ct. 1179, 86 L.Ed. 1537.

9. The plaintiff's invention provides a simple structure that may be placed close to a burner and effects a very satisfactory result as contrasted with the prior art.

10. The prior art is not close to the Claims in suit, and all prior art devices, which affected both fuel flow and ignition, are remote from Hall's patent.

11. The Stewart Warner South Wind Heater, plaintiff's Exhibit B, is and has been continuously in the same structural and operating condition as it was at the time of its sale by Montgomery Ward and Company, except for such changes as normally occur in South Wind Heaters due to normal operation thereof.

12. Stewart Warner South Wind Heaters, Model 718 (which is the "Junior Model," R. 7417), 780 and 781, have identical principles of operation, are identical except as to size, and all such heaters that have been sold since the grant of plaintiff's patent in suit, infringe Claims 5, 6, 11, 14, 21, and 27, of that patent.